IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 8, 2014

**STATE OF TENNESSEE vs. MARKIUS WILLIAMS**

**Appeal from the Criminal Court for Shelby County**
**No. 1202349    Carolyn W. Blackett, Judge**

_____

**No. W2013-01194-CCA-R3-CD - Filed November 21, 2014**

_____

The defendant was convicted, after a jury trial, of two counts of aggravated robbery, Class B felonies, and sentenced to concurrent nine-year sentences for a robbery of a couple that took place outside a laundromat. The indictment charged the defendant with having accomplished the crimes with a deadly weapon or through the display of an article used or fashioned to lead the victims to reasonably believe it was a deadly weapon. The trial court correctly instructed the jury orally regarding the elements of aggravated robbery in both counts. However, the written jury instructions for Count 2 omitted the element that the defendant used a deadly weapon and instead instructed the jury to consider whether the victim suffered serious bodily injury. The defendant appeals, challenging both the sufficiency of the evidence and the incorrect instructions under plain error. We conclude that the evidence is sufficient to support the verdicts and that the error in charging the jury was harmless beyond a reasonable doubt because the jury necessarily found that the defendant used a deadly weapon when it convicted the defendant in Count 1. We accordingly affirm the convictions.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN, J., joined. JERRY L. SMITH, J., not participating.

Stephen Bush, District Public Defender; and Sanjeev Memula and Anna Benson (at trial), and Phyllis Aluko (on appeal), Assistant District Public Defenders, for the appellant, Markius Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Amy

P. Weirich, District Attorney General; and Paul Hagerman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The defendant was charged with the aggravated robberies of James David Oliver and Erica Oliver, a married couple who were robbed at gunpoint outside a laundromat in Shelby County on December 9, 2011. The attendant at the laundromat, who initially appeared to be another victim, eventually confessed that she had not been robbed but was acquainted with the perpetrators and had been aware that the robbery would take place. She implicated the defendant and two other men in the crime. One of the victims was able to identify the defendant from a photographic lineup.

At trial, Mr. Oliver testified that on December 9, 2011, he and his wife went to the laundromat because their home machine was broken. Ms. Oliver had just cashed her paycheck and had eight or nine hundred dollars hidden in her bra. The Olivers parked behind the building, with the trunk of their car facing a wooded area. During the approximately two hours that they spent at the laundromat, Ms. Oliver washed the clothes, pulling the money out of her bra in front of the laundry attendant to make change at the machine. Mr. Oliver was in and out of the building attempting to fix a malfunctioning alarm on their car. Mr. Oliver testified that he did not remember exactly when he and his wife arrived, but he said that it was dark when they left. While going in and out of the laundromat, Mr. Oliver noticed a man sitting in a car, and he said hello to the man.

The robbery occurred as the victims were preparing to leave. The laundry attendant had held the back door open for Ms. Oliver so that she could bring the clothes to the car. Mr. Oliver testified he was by the rear passenger's side tire and Ms. Oliver was by the trunk. They both had their backs to the wooded area. Mr. Oliver suddenly saw two men. The men first pretended to rob the attendant, who was yelling that she didn't have anything. Ms. Oliver defended the attendant, saying, "Leave her alone. . . . [S]he don't have nothing." One of the men, whom Mr. Oliver identified as the defendant, had a gun and jammed it to the back of Ms. Oliver's head, telling her to give him her money. The defendant immediately grabbed the money from her bra, without searching elsewhere first. The defendant then held the gun pointed at Ms. Oliver while the man who had been sitting in the car earlier, and who

was unarmed, came around and robbed Mr. Oliver of his billfold.[1]  Mr. Oliver testified that he was afraid during the encounter.  After the men left, the victims asked the attendant, who still had her phone, to call the police.  She told them that her phone was not working. Ms. Oliver then ran into traffic to flag down help.  The victims began to suspect that the attendant was in league with the robbers, and they reported their suspicions to the investigator who had phoned them the next day.

Mr. Oliver testified that, although it was dark, he could clearly see the defendant from the light coming from the building.  Mr. Oliver identified the defendant from a photographic lineup.  He described the gun as a gray and black .22 target pistol with a long barrel.

The defense impeached Mr. Oliver with inconsistencies within his testimony and between his testimony and a statement made to police nine days after the crime.  Mr. Oliver's police statement alleged that $200 had been taken from his billfold, but his testimony at trial was that he had no money in the billfold, which had a maxed-out credit card, his identification, and his social security card.  On redirect, he testified that he did not remember if he had money but did not think he did.  He acknowledged that he could not identify from the photographic lineups either the attendant or the man who took his wallet.  He also acknowledged that he did not describe the robbers at all in his statement except to say one was bigger and one was smaller, but he explained that he was not asked to give a description because the police were preparing to show him the photographic lineups.  Mr. Oliver's statement indicated that the man from the parking lot had been talking to the attendant all night and was therefore involved; however, he acknowledged that his testimony at trial was the opposite in that he testified he did not see the man in the car or the attendant speak on the phone.  He also acknowledged that his statement said, "The guy that run up to me had a gun. I couldn't see if the guy that run up on my wife had a gun or not," which was the opposite of his testimony at trial.  He maintained, however, that the defendant's face and his gun were the focus of his attention and were engraved on his mind.

Ms. Oliver confirmed that the couple went to the laundromat on December 9, 2011, that her husband was in and out of the building, and that she had $800 cash in one side of her bra.  She also had her medicine in the other side.  Ms. Oliver spoke with the attendant several times, and she believed that the attendant saw the "big wad" of money she was taking out of her bra.  The attendant asked Ms. Oliver for a cigarette several times.  The attendant went in and out of the business, and she was talking on the phone while Ms. Oliver was washing the clothes.  When Ms. Oliver's laundry was finished, the attendant asked for a cigarette again, and Ms. Oliver gave her one and asked her to hold open the back door to help get the laundry to the car.  When they went out, Mr. Oliver was by the trunk and had the hood up.  Ms.

---

[1] Mr. Oliver testified at one point that the man took his cell phone, but he also testified that he did not have his cell phone with him.

Oliver was spreading a comforter over the back seat and the attendant was holding some clothing for her when she heard the attendant yell, "Get off me. I told you I don't have anything." Ms. Oliver defended the attendant, saying, "She told you she didn't have anything." She turned and saw a man standing by the attendant. The man was pointing a gun at Ms. Oliver's chest. He said, "I'm going to get what you have." He then immediately grabbed the money from one side of her bra and the medicine from the other. The man put his hand down her pants, looking for more money. He then turned her to face the car and hit her twice "very hard" on the neck with a metal object. She heard a click. She then heard a different voice say to her husband, "Give me what you got."

After the assailants left, the attendant refused to call the police, telling them that her phone did not work. Ms. Oliver ran into traffic because she was so terrified. She testified that they took her money, her medicine (which was recovered at the scene), a purse she had left in the car, and a container of change. Although the attendant had told them that her phone did not work, she began to talk on the phone as soon as they returned to the laundromat. Ms. Oliver's suspicions against the attendant were also aroused because the attendant knew where her money was and because she hyperbolically told police that Ms. Oliver had saved her life. Ms. Oliver was able to identify the attendant from a photographic lineup. She could not identify the defendant. Ms. Oliver explained that he had worn a toboggan during the robbery and his hair was in long braids and that the picture was not a recent one. She could not, of course, identify the second robber, whom she had only heard and not seen. The defendant had a long, silver gun.

Desiree Thompson, the laundromat attendant, also testified for the State. Ms. Thompson was charged in the same indictment as the defendant with facilitation of aggravated robbery, and had initially been charged with aggravated robbery. She stated that she was hoping for a benefit by testifying for the State. She also said that no promises had been made to her by the prosecution, but that she had been told to testify by the prosecutor and her attorney.

Ms. Thompson testified that while she was at work on the day of the crime, her boyfriend, Quandero "Meko" Williford, had been sitting behind the laundromat in her car with the defendant, who was his nephew and close friend, and with another man. Mr. Williford called her on the phone and asked her what Ms. Oliver was pulling in and out of her bra. Ms. Thompson told him that all she had seen was a pill bottle. Mr. Williford then asked her to go outside with Ms. Oliver and smoke a cigarette. Ms. Thompson knew that they were planning a robbery, but she testified she was afraid to say anything. Ms. Thompson testified she went out through the back door with the victims. She was holding some clothes while Ms. Oliver put a blanket on the back seat. At that point, the defendant ran over with a man she recognized as a friend of the defendant and Mr. Williford. The defendant had a gun and the other man did not. He held the gun while the other man put his

hand in Ms. Oliver's shirt to get the money. She did not see him put his hand in her pants but saw the men pull something from Mr. Oliver's back pocket. They also pretended to rob Ms. Thompson but did not take anything from her.

When the victims asked her to call the police, her phone was dead. Ms. Oliver ran into the street, and Ms. Thompson went into the laundromat where another customer eventually called the police. She told police she had been robbed, although this was a lie. After she plugged in her phone inside the laundromat, Mr. Williford called her twice, asking about the police. He then picked her up across the street and told her they got $600 or $800 and had split it three ways. Ms. Thompson was brought in for questioning on December 16th, and she quickly confessed and was arrested. She testified that she was telling the truth now because she did not think Ms. Oliver deserved what had happened and because she had known about the robbery and allowed it to take place. She acknowledged that Mr. Williford had told her that they were about to rob the victims and that she nevertheless attempted to lure Ms. Oliver out to smoke a cigarette.

Officer Phillip Beasley testified that he responded to the scene and that a law enforcement officer attempted to lift fingerprints from the crime scene but that the prints were not of good enough quality to compare to the fingerprints of any suspects. Investigator John Simpson testified that after the victims shared their suspicions of Ms. Thompson, he questioned her and she fairly quickly confessed. She implicated the defendant, her boyfriend, and a man she knew only as "B." He testified that he was not able to immediately locate either the defendant or Mr. Williford. He never discovered the identity of "B." Mr. Williford was never arrested.

The trial court and counsel discussed the jury instructions prior to closing arguments. The State asked the court to take out the charge on the lesser included offense of attempt, since the testimony only supported a completed crime. The trial court responded, "I'll get reversed on it if I don't do it. I thought you were going to say bodily injury because it was like back and forth about that too–"[2] Defense counsel did not object to the instructions. When the trial court read the jury instructions aloud, both Count 1, charging the aggravated robbery of James David Oliver, and Count 2, charging the aggravated robbery of Erica Oliver, included as an element that the jury must find the defendant used a deadly weapon or displayed an article used or fashioned to lead the victims to reasonably believe it was a deadly weapon, as charged in the indictment. However, the written instructions for Count 2 instructed the jury to find the defendant guilty if the State proved, beyond a reasonable

---

[2] The jury was also charged with the lesser included offense of aggravated assault, including the element that the defendant either intentionally or knowingly caused bodily injury to another or that the defendant intentionally or knowingly caused another to reasonably fear imminent bodily injury. "Bodily injury" was defined as part of this offense.

doubt, that the victim had suffered serious bodily injury. This element was not defined. There was no mention of the use of a deadly weapon in the instructions for aggravated robbery in Count 2. The jury found the defendant guilty of aggravated robbery in both counts. The trial court sentenced the defendant to two concurrent nine-year sentences.

In the motion for a new trial, the defense challenged the sufficiency of the evidence and other alleged errors not raised on appeal. The defense now argues that the trial court erred in denying the motion for a new trial because the evidence was insufficient to support the verdict. The defendant also asks this court to find plain error in the use of the incorrectly written jury instructions.

## ANALYSIS
### I. Sufficiency of the Evidence

The defendant appeals the sufficiency of the evidence. This court must set aside a finding of guilt if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). In evaluating the sufficiency of the evidence, the court must determine whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002). This court neither reweighs nor reevaluates the evidence, nor may it substitute its inferences for those drawn by the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *Id.* The State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that can be drawn from it. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury." *Reid*, 91 S.W.3d at 277.

In challenging the sufficiency of the evidence, the defendant cites the motivation of Ms. Thompson to protect her boyfriend and the inconsistencies in Mr. Oliver's statement to police and his testimony. This challenge is one regarding the credibility of the witnesses. Questions regarding witness credibility are, of course, entrusted to the jury for resolution. *Bland*, 958 S.W.2d at 659. The defendant also challenges the sufficiency of the evidence to sustain the conviction for the aggravated robbery of Mr. Oliver on the basis that Mr. Oliver testified that the unarmed man, and not the defendant, was the one who actually took his billfold.

Aggravated robbery, as charged here, is the intentional or knowing theft of property from the person of another by violence or putting the person in fear accomplished with a

deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon. T.C.A. § 39-13-401, -402(a)(1). Theft of property is committed when the offender, with intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. *Id.* § 39-14-103(a). The jury in this case was instructed to consider guilt under a theory of criminal responsibility. Under Tennessee Code Annotated section 39-11-401(a), "a person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Criminal responsibility is triggered when the offender, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." *Id.* § 39-11-402(2). The State must establish that the defendant "knowingly and voluntarily shared in the criminal intent of the crime and promoted or assisted its commission." *State v. Pope*, 427 S.W.3d 363, 369 (Tenn. 2013). Mere presence and companionship with the perpetrator before, during, and after the commission of a crime are circumstances through which participation may be inferred. *Id.*

Here, Ms. Thompson testified that the defendant, Mr. Williford, and another man were sitting in a car outside the laundromat. Mr. Williford noticed that one of the victims had something of value concealed in her bra and asked Ms. Thompson about it. He told her that the victims would be robbed and asked her to lure Ms. Oliver outside to smoke a cigarette, which she attempted to do. She testified that when she went outside with the victims, the defendant and the unidentified third man came up and robbed the victims, also pretending to rob her. The defendant was the gunman, and Mr. Williford told Ms. Thompson that they had split the money three ways. Both victims testified that Ms. Thompson had an opportunity to observe where Ms. Oliver kept her money. When they went outside, two men, one holding a gun, came up to rob them. The men demanded valuables from the attendant, but inexplicably did not take anything from her, including her cell phone. The man robbing Ms. Oliver seemed to know exactly where her money was. Property was taken from both victims. Mr. Oliver identified the defendant as the gunman from a photographic lineup, corroborating the accomplice's testimony. *See State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). Both victims testified that they were in fear. A rational trier of fact could have found that the State had shown beyond a reasonable doubt that the defendant intentionally took property from the victims, without their consent, by violence or putting them in fear, and that he did so through the use of a deadly weapon, or alternatively that, by threatening the victims with the gun during the robbery and sharing in the proceeds, he was criminally responsible for the actions of the other perpetrator. The defendant is not entitled to relief as to this issue.

## II. Jury Instructions

The defendant next asserts that his conviction for the aggravated robbery of Ms.

Oliver must be overturned because the jury was incorrectly instructed to find, as the aggravating element, that the victim suffered serious bodily injury rather than that the defendant accomplished the robbery with a deadly weapon as charged in the indictment. He also challenges his conviction for the aggravated robbery of Mr. Oliver, asserting that the conviction was tainted by the incorrectly written instructions in Count 2. The State acknowledges that the jury was incorrectly instructed, but asserts that the error was harmless beyond a reasonable doubt.

The defendant did not object to the written instructions or raise this issue in his motion for a new trial. Accordingly, our review is for plain error. *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005) (concluding that an erroneous jury charge is not waived by failure to contemporaneously object but is waived by failure to raise the issue in a motion for a new trial). In evaluating plain error, the reviewing court must find the presence of five factors:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The error must additionally be of such magnitude that it probably changed the outcome of the trial. *Id.* at 283; *see also State v. Hugueley*, 185 S.W.3d 356, 383 (Tenn. 2006) (concluding that no substantial rights of the accused were affected by omission from jury instructions of the element that the defendant knew the victim was a corrections employee engaged in official duties because the defendant admitted the existence of this element).

The defendant has a right to both a trial by jury and a correct and complete charge of the law. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). However, an incorrect jury instruction does not necessarily compromise the integrity of the trial and require automatic reversal. *Id.* at 434. "The misstatement of an element in jury instructions is subject to constitutional harmless error analysis." *Faulkner*, 154 S.W.3d at 60 (citing *Pope v. Illinois*, 481 U.S. 497, 501-03 (1987)); *see also State v. Cecil*, 409 S.W.3d 599, 610 (Tenn. 2013). The error must be harmless beyond a reasonable doubt, which is the case when the court determines that it appears "'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *State v. Allen*, 69 S.W.3d 181, 190 (Tenn. 2002) (quoting *Neder v. United States*, 527 U.S. 1, 15 (1999)). "[T]he touchstone of this inquiry is whether a rational trier of fact could interpret the proof at trial in different ways." *Cecil*, 409 S.W.3d at 610. It should be "'clear beyond a reasonable doubt that a rational jury would

have found the defendant guilty absent the error.'" *State v. Ducker*, 27 S.W.3d 889, 899 (Tenn. 2000) (quoting *Neder*, 527 U.S. at 18). When an element of a crime is omitted, the reviewing court must decide if "the record contains evidence that could rationally lead to a contrary finding by the jury with respect to the omitted element." *State v. Richmond*, 90 S.W.3d 648, 657 (Tenn. 2002). Furthermore, "[w]hen the jury's verdict 'necessarily included a finding' on the omitted element, the error may be harmless." *Allen*, 69 S.W.3d at 190 (quoting *Neder*, 527 U.S. at 26 (Stevens, J., concurring)) (concluding that an error could be harmless even when the jury's verdict did not necessarily include the finding). "[W]here a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." *Neder*, 527 U.S. at 17.

The Tennessee Supreme Court has concluded that errors in jury instructions were harmless in cases where the omitted element was not contested and was overwhelmingly supported by the evidence. *Richmond*, 90 S.W.3d at 663 ("[N]o reasonable jury would have convicted the defendant on the lesser-included offenses of robbery and attempted robbery instead of the charged offenses due to the uncontroverted and overwhelming evidence establishing the use of deadly weapons and his direct participation in the offenses."); *Garrison*, 40 S.W.3d at 435 (finding omission of a mens rea element, requiring the intent to solicit as well as the intent that the crime be committed, to be harmless because "the omitted intent requirement was not contested at trial and essentially ha[d] been conceded."); *Ducker*, 27 S.W.3d at 899-900 (concluding that omission of instruction requiring the jury to find that the victims were under six years old was harmless when all the evidence at trial demonstrated that they were toddlers, and the defendant never contested this element).

Likewise, where a jury's finding necessarily decided an improperly omitted issue, the Tennessee Supreme Court has held the error harmless. In *State v. Locke*, the trial court failed to instruct on certain lesser included offenses, including facilitation of the underlying felony for felony murder. The Court concluded the error was harmless beyond a reasonable doubt because the jury had found the defendant guilty of felony murder, and in so doing, it had necessarily rejected the charge of facilitation of felony murder. *State v. Locke*, 90 S.W.3d 663, 675 (Tenn. 2002).

In this case, the jury convicted the defendant of the aggravated robbery of Mr. Oliver, finding, as an element of that crime, that he accomplished the robbery with a deadly weapon. The robberies were committed simultaneously, and the evidence that supported a finding that the defendant held a gun during the robbery in Count 1 was the same evidence relied on by the State to show the use of a deadly weapon in Count 2. Accordingly, the jury necessarily found the element misstated in Count 2 – that the robbery was accomplished with a deadly weapon – when it convicted the defendant in Count 1. The jury was correctly instructed on

Count 1 and is presumed to follow the court's instructions. *State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006). Because the jury's verdict necessarily included the finding that the robbery was accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon, we conclude that the error was harmless beyond a reasonable doubt. We note that, alternatively, the evidence that a weapon was used was uncontroverted and essentially conceded at trial by the defense, which proceeded on a theory of mistaken identity. Because correction of the error is not necessary to do substantial justice, the defendant is not entitled to relief as a result of plain error. *See Smith*, 24 S.W.3d at 282; *see also Johnson v. United States*, 520 U.S. 461, 470 (1997) (pretermitting issue of whether the failure to submit an issue to the jury affected the defendant's substantial rights because the error did not affect the fairness, integrity, or public reputation of judicial proceedings).

## CONCLUSION

Based on the foregoing reasoning, the judgments of the trial court are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE